UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at PIKEVILLE

CRIMINAL ACTION NO. 12-05-ART-4

UNITED STATES OF AMERICA,                                          PLAINTIFF,

V.                          **MAGISTRATE JUDGE'S REPORT
                            & RECOMMENDATION**

TED M. SLONE,
        aka "BO" SLONE,                                           DEFENDANT.

**********

Presently before the Court is Defendant Ted Slone's Motion to Suppress. [R.176]. Slone

seeks to suppress all statements he made to law enforcement officials and all evidence seized during

an interview and search conducted at his home on June 29, 2012. The Court held an evidentiary

hearing on the Motion on June 6, 2013, and took the matter under advisement. Consistent with local

practice, it has been referred to the undersigned to prepare a report and recommendation pursuant

to 28 U.S.C. § 636(b).[1] [*See* Record No. 86-1]. Having considered the evidence presented at the

evidentiary hearing,  the parties' briefs [Record Nos. 176, 178[2]], and the applicable law, it is

---

[1] Motions *in liminie* are reserved for presiding Judge Amul Thapar. The Defendant
indicates he is moving the Court "*in liminie* to suppress the non-Mirandized incriminating
statements" he made during the June 29, 2012 interview.  His request, however,  is appropriately
presented as a Motion to Suppress, and the Court will construe it as such.

[2]The Defendant filed a Supplemental Memorandum in Support of his Motion after the
evidentiary hearing. [Record No. 186]. The Defendant did not have leave to file this
supplemental brief. Therein, the Defendant argues that exigent circumstances did not exist to
justify the warrantless search of the Defendant' residence, or in the alternative, that exigent
circumstances were created by law-enforcement officials and thus, cannot justify the warrantless
search of the Defendant's residence. While the Court recognizes the filing, it has no bearing on

recommended that the Defendants' Motion [Record No. 176] be denied.

## I.  FACTUAL BACKGROUND

During the June 6 evidentiary hearing, the United States called as witnesses the three (3) law enforcement officials who conducted the June 29, 2012 interview of Slone and search of his home, DEA Special Agent Greg Bunch[3], DEA Task Force Officer Brian Metzger[4], and Operation UNITE Detective Willie Skeens.[5] The officers consistently testified to the following, relevant facts: On June 29, 2012, Agent Bunch, Officer Metzger, and Detective Skeens went to Slone's residence to speak with him about his alleged involvement in a conspiracy to distribute oxycodone with his now co-Defendant Russell West. The officers thought Slone may be willing to cooperate with law enforcement officials in the investigation of West. The officers arrived in unmarked vehicles[6], in plain clothes, and with any firearms holstered. They first encountered Slone and his brother, William "Billy" Slone (hereinafter "Billy"), as Slone and his brother were exiting a side door of Slone's home. Upon meeting, the officers identified themselves as law enforcement officials, and Agent Bunch asked if he could speak with Slone inside the home while Detective Skeens asked to speak

the Defendant's Motion. The government bears the burden of proving by a preponderance of the evidence that an exception to the warrant requirement applies. *See, e.g.*, United States v. Washington, 573 F.3d 279, 286 (6th Cir. 2009) (government bears burden of proving exigent circumstances). The Government has not argued that exigent circumstances existed to justify the admission of the evidence seized during the warrantless search of Slone's residence.

[3]Agent Bunch has been with the DEA for eight (8) years.

[4]Officer Metzger has been with the DEA for four(4) years, and has been a law enforcement official for approximately eleven (11) years.

[5]Detective Skeens has been a detective for Operation UNITE for three (3) years, and has been a law enforcement official for approximately fourteen (14) years.

[6] None of the law enforcement witnesses could recall whether they arrived in one (1) or two (2) unmarked police cruisers.

with Billy. Both individuals agreed to speak with the officers. Thereafter, Slone led Agent Bunch into his home so they could speak, and Detective Skeens and Billy went to speak in Detective Skeens' vehicle.

Once inside, Agent Bunch and Defendant went to the kitchen area of the home to sit down at a table and talk. [*See* Government's Exhibit #5: 8 X 10 Paper photograph of Ted Slone at his residence]. Agent Bunch first told Slone  that he was not under arrest and asked him if he knew why the officers were at his home. Slone indicated he did not know, and Agent Bunch explained that they had received information implicating him in a drug trafficking conspiracy.  Agent Bunch then asked Slone if he wanted to help the officers out and if he minded talking to them, and Slone indicated his willingness to speak with the officers.  Thereafter, Agent Bunch interviewed Slone. During this interview, Slone willingly explained, in some detail, his involvement in drug trafficking with Russell West and Jermaine St. Clair Littles. [*See* Record No. 178-1 "DEA Report of Investigation."] He went on to name several other individuals whom he knew to be a source of supply to the oxycodone drug trade in Kentucky. [Id.].

Officer Metzger joined Slone and Agent Bunch in the kitchen at some point during this interview.  Because Slone kept fidgeting with a bulge in his pocket, Agent Bunch asked Slone if he could see what was in his pocket.  Slone removed the contents of his pocket, placing an undisclosed amount of U.S. currency and a glass bottle on the kitchen table.[*See* Government's Exhibt #3: 8 X 10 Paper photograph of clear glass bottle on table].  Pursuant to Agent Bunch's request,  Slone then granted Agent Bunch permission to look inside the bottle,  stating it contained his medicine. Agent Bunch observed ten (10) suspected oxycodone tablets inside the glass bottle. [*See* Government's Exhibt #4: 8 X 10 Paper photograph of clear glass bottle with 10 white pills laying beside it]. After

this observation, Agent Bunch asked Slone if there were any additional oxycodone tablets or large sums of U.S. currency located in his home. Slone answered that there was not and that Agent Bunch could search any part of the home. Agent Bunch then clarified with Slone that he was granting the officers consent to search the home, vehicles, and any outbuilding on Slone's property. Slone agreed.

Meanwhile, Agent Skeens had concluded his conversation with Billy, told him he was free to go, and Billy had left the premises. Sometime after Slone had given his consent for the officers to search his residence, Detective Skeens joined the Defendant, Agent Bunch, and Officer Metzger in the kitchen. After being informed of Slone's consent to search, Detective Skeens asked Slone if he minded securing his large, unsecured, outside dog so that Detective Skeens could safely search the Defendant's vehicles and outbuildings. Slone agreed, exited his residence with Detective Skeens, and secured his dog so that Detective Skeen could search outside. Slone went as far as to secure his dog at the back of the house when Detective Skeens was searching the front part of his home and to re-secure the dog at the front of his home when Detective Skeens moved to search the back of the house.

Also around the time Slone had given his consent for the search of his residence, his wife, Sabrina, arrived home and joined him, Agent Bunch, and Officer Metzger in the kitchen. Sabrina spoke freely with the officers, leading them to the location where Slone keeps his medications in their bedroom. Sabrina also accessed her personal Facebook profile in order to show the officers photos of one individual unfamiliar to them whom Slone had named as a Kentucky oxycodone supplier.

After completing a thorough search of Slone's property, the officers seized two (2) cell

phones, the 10 oxycodone pills taken from Slone's pocket, a bottle of oxycodone pills and a bottle of oxymorphone pills prescribed to Slone, Slone's 2007 Chevrolet Silverado, a clear plastic bag from which a prescription label had been removed containing fourteen (14) soboxone strips, a PVC pipe which had been identified by Russel West as where Slone stored his oxycodone tablets, and approximately $800.00 U.S. Currency from Slone. The officers did not take any U.S. Currency in Sabrina's possession. The officers also found two unfilled prescriptions for oxycodone and Opana prescribed to Slone one day before the search, on June 28, 2012, which they photographed, but did not seize. [*See* Government's Exhibit #1: 8 X 10 Paper photograph of enlarged copy of prescription for oxycodone dated 6/28/2012; Government's Exhibit #2: 8 X 10 paper photograph of enlarged coy of prescription for Opana ER dated 6/28/2012].  The entire encounter at Slone's home lasted about one (1) hour, with the interview lasting approximately twenty (20) minutes, and the search of the residence lasting approximately forty (40) minutes. At no point during the interview was the Defendant read his <u>Miranda</u> rights or advised of his right to refuse to speak with the officers.At no point did the officers threaten, handcuff, or confine Slone or his wife to any part of the home. Slone and Sabrina were able to smoke, drink, and move around the premises freely. [*See* Government's Exhibit #6: 8 X 10 Paper photograph of Mrs. Slone]. Agent Bunch only made two (2) requests upon them: (1)  that they refrain from picking up weapons while the officers were still upon the premises; and (2) that they refrain from flushing the toilets so as to prevent the destruction of any evidence. Each of the officers were impressed with how polite and pleasant the Slones were during the encounter.

     At the June 6 hearing, Slone called one (1) witness, his brother Billy Slone. Billy disputed the facts surrounding the officers' initial encounter with the Defendant as well as his own interaction

with Detective Skeens.  According to Billy, he and Slone went to the side door, but were not exiting the house as the officers approached the side door on foot.  Billy Slone also contends, in opposition to the testimony of Agent Bunch, Officer Metzger, and Detective Skeens, that the officers barged into Slone's  home, surrounding  him before requesting they sit down and talk. Billy Slone also claims one of the officers grabbed Slone, effectively leading him to the kitchen. Finally, Billy contends that Detective Skeens did not tell him he was free to go, but instead, told him that he should leave the premises. According to Billy, Detective Skeens did not allow him to come into the house with his brother.

## II. PROCEDURAL BACKGROUND

Based, in part, on Slone's admissions and the evidence seized from his home during the June 29, 2012 encounter, he, Russell West, Jermaine St. Clair Littles, and another co-Defendant, Kenneth Gannon, have since been charged, by Indictment, with conspiracy to distribute oxycodone, in violation 18 U.S. C. §. 846 [Record No. 72].  Slone was arrested on or about December 3, 2012, and released on bond pending trial. [Record Nos. 84; 85].  He filed the instant Motion to Suppress on May 14, 2013. [Record No. 176[7]].

## III.  DISCUSSION

In Slone's Motion to Suppress [Record No. 176], he seeks to suppress the statements he made to law enforcement on June 29, 2012, asserting the statements were made in violation of his Fifth Amendment right. As grounds, he contends that during the interview he was subject to a *de facto* arrest and should have been read his <u>Miranda </u>rights. Slone also seeks to suppress any evidence

---

[7] The Court held an evidentiary hearing on Slone's Motion to Suppress on May 24, 2013. At this hearing, the Defendant withdrew the Motion. [Record No. 179]. The Court granted Defendant's request to reinstate the Motion to Suppress on June 3, 2013. [Record Nos. 180; 183]

seized during the June 29, 2012 search of his home asserting that this evidence was procured in violation of his Fourth Amendment right.  As grounds,  he contends the search was conducted without an appropriate warrant, and the Defendant did not consent to the search. The United States has responded to the Defendant's Motion, in opposition to each of his claims. [Record No. 178]. In regard to Slone's Fifth Amendment claim, the United States asserts that he was not in custody during his consensual interview with law enforcement, and, accordingly,  notice of the Fifth Amendment's protection against self-incrimination, via Miranda warnings, was not triggered. In regard to the Slone's Fourth Amendment claim, the United States straightforwardly asserts that he consented to the search of his residence.

Suppression of evidence is only appropriate when evidence is obtained in violation of a defendant's constitutional rights. See Mapp v. Ohio, 367 U.S. 643 (1961).  A person who claims to have been aggrieved of a constitutional violation bears the initial burden of production and persuasion to suppress evidence. United States v. Smith, 783 F.2d 648, 650 (6th Cir. 1986). Once the defendant has made basis for his motion,  the government then has the burden of demonstrating that there was not a constitutional violation. *See* United States v. Bradley, 163 Fed. Appx. 353, 357 (6th Cir. 2005) (citing United States v. Matlock, 415 U.S. 164, 177 n. 14 (1974); Colorado v. Connelly, 479 U.S. 157, 168 (1986)).  The controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence. Matlock, 415 U.S. at 177 n. 14.

Here, Slone  has failed to meet his burden of proving that he was entitled to receive Miranda warnings. *See* United States v. Lawrence, 892 F.2d 80, 1989 WL 153161, *5 (6th Cir. 1989) (citations omitted) (holding that defendants seeking to suppress incriminating statements based on

the failure to receive Miranda warnings bear the burden of proving by the preponderance of the evidence that he or she was entitled to Miranda warnings). In addition, the United States has carried its burden of proving that Slone consented to the search of his residence. *See* United States v. Burns, 298 F.3d 523, 541 (6th Cir. 2002) (citations omitted) (noting "[i]t is the Government's burden, by a preponderance of the evidence, to show through 'clear and positive testimony' that valid consent was obtained.")  Accordingly, neither Slone's statements nor the fruits of the search of his residence need be suppressed. Each of his claims will be addressed, in turn, below.

## A. The Defendant was not "in custody" for purposes of triggering Fifth Amendment protection.

The Fifth Amendment protects an individual's right against self-incrimination, guaranteeing that a defendant cannot be "compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. To protect this important constitutional right, in Miranda v. Arizona the Supreme Court "established certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation." Duckworth v. Eagan, 492 U.S. 195, 201 (1989); *see also* Miranda v. Arizona, 384 U.S. 436, 478-79 (1966).  The Supreme Court has explained that 'custodial interrogation' is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. Put simply, to protect an individuals Fifth Amendment right, a recitation of the Miranda warnings is required when a suspect is found to be both: a) in custody; and b) subject to interrogation by law enforcement.  Illinois v. Perkins, 496 U.S. 292, 296-97 (1990); Stansbury v. California, 511 U.S. 318, 322 (1994).  Slone asserts he was should have been informed of his Miranda rights, and thus, any incriminating statements he made to Agent Bunch were in violation of his Fifth Amendment

right. As it is Slone's burden to establish he should have received <u>Miranda</u> warnings,  the first question presented before the Court regarding the interview of Slone is, thus,  if he was "in custody" during his June 29, 2012 encounter with police.

In deciding whether a suspect is considered to be in custody for purposes of triggering <u>Miranda</u>, the "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977) (per curiam)). A situation is viewed as custodial if an objective consideration of the totality of the circumstances would lead "a reasonable man in the suspect's position" to believe that his freedom was restrained. <u>Berkmer v. McCarty</u>, 468 U.S. 420, 442 (1984); <u>Thompson v. Keohane</u>, 516 U.S. 99, 112-13 (1995). "The test must be not what the defendant himself . . . thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes."  <u>United States v. Sharp</u>, 680 F. Supp. 2d 895, 900 (E.D. Tenn. 2010) (quoting <u>United States v. Galloway</u>, 316 F.3d 624, 629 (6th Cir. 2003)).  The Sixth Circuit commonly considers four (4) factors in deciding whether an interrogation is custodial in nature: (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions.  <u>United States v. Hinojosa</u>, 606 F.3d 875, 883 (6th Cir. 2010); *see  also* <u>United States v. Panak</u>, 552 F.3d 462, 465 (6th Cir. 2009);  <u>United States v. Swanson</u>, 341 F.3d 524, 529 (6th Cir. 2003);  <u>United States v. Salvo</u>, 133 F.3d 943, 950 (6th Cir. 1998).

Looking at the totality of the circumstance surrounding Slone's interview with Agent Bunch on June 29, 2012 as measured by the custodial considerations espoused by the Sixth Circuit, the

Court cannot find that the Defendant has carried his burden of proving he was "in custody" for purposes of triggering Miranda. The first three (3) factors weigh heavily in finding that Slone was not "in custody." The interview was conducted in his own home; it lasted only around twenty (20) minutes; and there is minimal evidence of any restraint on the his freedom of movement. The fact that Slone was never informed of his right to refuse to answer Agent Bunch's questions does weigh in favor of finding him to have been in custody. Objectively looking at the totality of the circumstances, however, the interaction with Slone and the officers did not rise to the level of a "restraint on freedom of movement of the degree associated with a formal arrest." Stansbury, 511 U.S. at 322 (internal quotation marks omitted).

The facts of United States v. Panak are instructive on this finding. 552 F.3d. 462. In Panak, two (2) law enforcement officers were investigating Panak's boss, a dentist, for illegal drug distribution. The officers went to Panak's residence to speak with Panak about her boss's suspected illegal drug distribution, including the high volume of hydrocodone prescriptions he wrote without any apparent connection to dental work. The officers arrived in an unmarked car and knocked on Panak's door. Panak answered and the investigators told her that they wanted to ask her a few questions about her boss.  Recognizing the two men from a prior inspection at her work, Panak "let them in," proceeded to sit down on her living room couch, and the officers sat down on chairs accross from the couch. The officers began the interview by telling Panak her boss "was going to jail." Then, during the interview, Panak told the officers about her role in the office and what she knew about her boss's dental practice  The interview lasted between forty-five (45) minutes to an hour. At no point during the interview did the officers physically restrain or limit Panak's  freedom of movement in any way. The officers never raised their voices nor brandished weapons. In addition,

the officers never threatened Panak with arrest, never told her that she was in trouble, never told her that she was a suspect and never told her that she was potentially subject to criminal penalties. At no point was Panak advised of her Miranda rights, or her right to refuse to speak with the officers or request them to leave her home. A year after the interview, she was charged, by Indictment, with illegal possession and distribution of hydrocodone. Thereafter, she moved to suppress the statements she made during the interview with law enforcement arguing she should have been read her Miranda rights. The trial court originally granted Panak's motion. The Sixth Circuit Court of Appeals, however, reversed and remanded, specifically finding that the interview of Panak was conducted in a non-custodial environment.

In reasoning that Panak was not "in-custody" for purposes of triggering Miranda, the appellate court examined the four (4) custodial considerations set out above. As for the location of Panak's interview, the court generalized that the Miranda requirements often do not apply to an interview in a person's home, even when the individual has become the focus of an investigation. 552 F.3d. 462, 465 (2009) (citing Beckwith v. United States, 425 U.S. 341, 346 (1976) (quoting Miranda, 384 U.S. at 457)). The court reasoned that an important factor underlying Miranda was the interrogator's goal of "'isolating the suspect in unfamiliar surroundings 'for no purpose other than to subjugate the individual to the will of his examiner,'" noting that these concerns often do not come into play in in-home interrogations. Panak, 552 F.3d. at 465 (citing Beckwith 425 U.S. at 346) (quoting Miranda 384 U.S. at 457)).  In addition, the court rationalized that "individuals will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, in curbing the scope of the interview or in simply asking the officers to leave." Panak 552 F.3d at 466. The court carefully observed that

11

the generalization categorizing in-home interviews as non-custodial indeed has exceptions which may "transform one's castle into an interrogation cell," i.e. "[t]he number of officers, the show of authority, the conspicuous display of drawn weapons, [and] the nature of the questioning," but held that the interrogation of Panak "did not cross that line and retained a non-custodial hue throughout." Panak, 552 F.3d. at 465-66 (citing United States v. Craighead, 539 F. 3d 1073, 1083 (9th Cir. 2008) (internal quotations marks omitted)). As for the length and manner of questioning, the court remarked that the interview of Panak lasted between forty-five (45) minutes and an hour, " a length of time that compares favorably with other encounters [the Sixth Circuit has] deemed non-custodial." Panak, 552 F.3d. at 467 (citing United States v. Crossley, 224 F.3d 847, 862 (6th Cir. 2000) (less-than-an-hour interview); United States v. Mahan, 190 F.3d 416, 420, 422 (6th Cir. 1999) (hour-and-a-half interview)). The court also found the lack of restraint on Panak's movement to weigh in favor of non-custody, reasoning that the officers did not handcuff or physically restrain Panak, and they did not otherwise limit her freedom of movement. Panak, 552 F.3d. at 467 (citations omitted). The court also relied upon the facts that the officers arrived in an unmarked vehicle, that they never raised their voices, that no weapons were brandished, and that the officers did not even suggest that they were going to arrest Panak. Panak, 552 F.3d at 467 (citations omitted). The court remarked that only the final factor, the fact that Panak was not advised of her right to not answer the officers' questions and to end the interview at will, weighed in the direction of finding Panak to have been "in custody." Panak, 552 F.3d at 467. The court, however, swiftly noted that "the existence of such advice is one factor among many and "the Sixth Circuit has" never held that it is a necessary condition (as opposed to a frequently sufficient condition)" of finding an interview to be non-custodial. Panak, 552 F.3d at 467 (citing Swanson, 341 F.3d at 529). Looking at the totality of

Panak's circumstances in light of all four (4) custodial factors, the court found that "the investigators' conduct did little to make the familiar surroundings of Panak's living room a freedom-robbing environment, and it thus did not rise to the level of a restraint on freedom of movement of the degree associated with a formal arrest." Panak, 552 F.3d at 368 (citing Stansbury, 511 U.S. at 322).

Here, just as in Panak, Slone's interview took place in the comfortable surrounding of his home. The undisputed facts are that three (3) officers arrived in an unmarked car, wearing plain clothes, and without any weapons brandished. Before asking Slone any questions, Agent Bunch sat down with him at his kitchen table and straightforwardly told Slone  he was not under arrest but that he had been implicated in a drug trafficking ring. He then asked Slone if he was willing to help the officers out in their investigation. There is no evidence that Agent Bunch's  questions were argumentative or that any of the officers' behavior was threatening. In fact, the three (3) officers each remarked upon the politeness of their encounter with the Defendnant and his wife during their sworn testimony at the June 6 hearing. Accordingly, the Court sees no reason to depart from the Sixth Circuit's generalization that the location of this  in-home interviews weighs in favor of finding that Slone was not "in custody."

As for the length and manner of questions, the interview of Slone took only twenty (20) minutes to complete. As noted in Panak, the Sixth Circuit has found interviews much longer than this to be non-custodial. *See* Panak, 552 F.3d at 467 (forty-five (45) minutes to an hour interview found non-custodial); Crossley, 224 F.3d at  862 (less-than-an-hour interview considered non-custodial); Mahan, 190 F.3d at 422 (hour-and-a-half interview considered non-custodial). And again, there is no evidence that Agent Bunch's questions were arguments or otherwise threatening.

Accordingly, the Court finds no reason, or argument from Slone, that this relatively short length of his interview weighs in favor of finding Slone to have been in custody.

Regarding the restraint on the Defendant's movement, the Court notes, again, several important, undisputed facts: Three (3) officers arrived in an unmarked vehicle, in plain clothes, with no weapons brandished at any point during the encounter. Before asking any questions, Agent Bunch sat down with Slone at his kitchen table and told him he was not under arrest. Agent Bunch then told Slone he had been implicated in a drug trafficking ring, but, instead of threatening Slone with criminal penalties, asked him if he was willing to help the officers out in their investigation of Russell West. Throughout the encounter, the officers never handcuffed or threatened Slone or his wife in any way. There is no evidence the officers ever raised their voices or suggested at any point during the encounter that they were going to arrest Slone. In fact, the Slones were free to move about their house.

Some evidence of Slone's freedom is seen in the fact that he willingly stepped outside the home to secure his dog so Detective Skeens could safely search the outside area of the home. Further evidence of his freedom is seen in the fact that his wife was using her personal computer to show the officers Facebook photos of an individual that Slone had implicated as a drug trafficker. While this fact does not bear directly on Slone's freedom of movement, it does provide evidence that Slone's encounter with the officers was not police-dominated, and that he and his wife could access their personal effects at will. It is important to note that Agent Bunch did place two requests upon Slone which did minimally limit his freedom: 1) that he refrain from picking up weapons while the officers were present; and 2) that he refrain from flushing the toilet. Significantly, however, Bunch's first request is justified by protecting officer safety, and his second is justified by the need

14

to preserve relevant evidence. Accordingly, the Court finds the third custodial consideration weighs in favor of finding the Defendant was not subject to a custodial interview.

Finally, just as in Panak, the fact that the Defendant was not advised of his right to refuse to answer the officer's questions or ask them to leave undoubtedly cuts against the other three (3) custodial considerations, weighing in favor of finding that Slone was subject to a custodial interview. Objectively looking at the totality of the circumstances surrounding Slone's interview with Agent Bunch, however, this fact alone hardly rendered the Defendant's home a "freedom robbing environment." Panak 552 F.3d at 468. A reasonable person, innocent of any crime, would not have felt as if he or she were subject to formal arrest during Slone's twenty (20) minute in-home interview with Agent Bunch. See Sharp, 680 F.Supp.2d at 900; Stansbury, 511 U.S. at 322)). Accordingly, the Court finds Slone was not in custody and not entitled to receive Miranda warnings.

Notably, this finding holds true even when considering Billy Slone's version of the facts. Billy disputes the officers' testimony about their initial encounter with the Defendant, claiming that, before Agent Bunch requested that Slone speak with him, the officers barged in Slone's home as he was standing at the side door, not exiting therefrom. Bill also claims the officers "surrounded" Slone, somehow grabbing him and leading him to the kitchen table. For this Miranda analysis, the Court only considers what an objectively reasonable man would find as rising to the level of formal arrest, not Billy's or anyone else's subjective beliefs. See Sharp, 680 F.Supp.2d at 900. Even considering Billy's observations, it remains undisputed that there were only three (3) officers at Slone's home, and only two (2) in the kitchen with him for most of the interview. The officers arrived in an unmarked vehicle, in plain clothes, and never brandished any weapons or raised their voices. Billy does not maintain that Agent Bunch failed to inform Slone, at the outset of the

15

interview, that he was not under arrest or that Agent Bunch failed to ask Billy *if* he wanted to talk to the officers and help them out with their investigation of Russell West.  Billy does not maintain that the officers ever threatened Slone, ever compelled him to speak, or that they otherwise physically restrained Slone. Thus, looking at the totality of the circumstances, especially considering the location and brevity of the interview as well as the fact that the Defendant was never handcuffed or threatened with arrest, the Court finds that an objectively reasonable person would still not view Slone's encounter with law enforcement as rising to the level of formal arrest.

Sixth Circuit precedent supports this finding. *See* United States v. Robinson, 217 Fed. Appx. 503, 507-509 (6th Cir. 2007) (questioning did not rise to the level of custodial interrogation when three officers questioned defendant in living room about location of firearms even though defendant was not informed that the questioning was voluntary) cert. denied, 552 U.S. 846 (2007); United States v. Warner, 971 F2d 1189. 1201 (6th Cir. 1992) (law officers not required to give Miranda warnings in consensual workplace interview in an unlocked classroom where there was no display of force or weapons and a reasonable person would believe that she was free to leave); United States v. Flores, 193 Fed. Appx. 597, 605-606 (6th Cir. 2006); (Miranda warnings not required when six officers entered interviewee's home, interviewee was not handcuffed, confined or restrained and had a "casual conversation" with a detective while sitting on the living room sofa).  Moreover, the circumstance surrounding Slone's interview differ materially from cases in which courts have found Miranda custody. *See, e.g.*,; Orozco v. Texas, 394 U.S. 324, 325-27 (1969)  (suspect in custody when questioned after being awakened in his room by four officers at 4:00  a.m. and one officer testified that "[f]rom the moment he gave his name" the defendant was "not free to go where he pleased but was under arrest"); United States v. Revels, 510 F.3d 1269, 1275-1277 (10th Cir. 2007)

16

(defendant was in "custody" where suspect and her boyfriend were awoken at 6:00 a.m. by officers' forcible entry into her home, suspect was immediately detained, handcuffed, and separated from boyfriend, and suspect was not told she was free to leave); United States v. Colonna, 511 F.3d 431, 434-437 (4th Cir. 2007) (Miranda custody found when twenty four FBI agents inundated defendant's residence, awakened defendant at gunpoint, guarded him at all times, never told him that he was free to leave or that he did not have to respond to questions, and questioned him for nearly three hours).

Having determined that Slone has not met his burden of proving he was in custody for Miranda purposes, the Court need not consider whether he was interrogated for Miranda purposes. Slone's interview was non-custodial, and thus, his right to be informed of his Fifth Amendment right, via Miranda, was not triggered. Accordingly, there was no violation of his Fifth Amendment right, and suppression of any statements he made during the June 29, 2012 interview with Agent Bunch is not warranted.

## B. The Defendant consented to the search of his residence, vehicles, and outbuildings.

The Fourth Amendment to the United State Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. AMEND. IV. "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). The Government makes one argument to justify the warrantless search of Slone's residence: the search was justified by the well-defined consent exception to the warrant

requirement, and accordingly, there was no violation of Slone's Fourth Amendment right. *See* Schneckloth v. Bustamonte, 412 U.S. 218, 222 (U.S. 1973) (citing Katz, 389 U.S. at 358; Vale v. Louisiana, 399 U.S. 30 (U.S. 1970)) (citations omitted). As it is the Government's burden to establish an exception to the warrant requirement, the only question presented before the Court in regard to the search of Slone's residence  is thus, whether he consented to the search of his residence. *See* United States v. Burns, 298 F.3d 523, 541 (6th Cir. 2002) (citations omitted) (noting "[i]t is the Government's burden, by a preponderance of the evidence, to show through 'clear and positive testimony' that valid consent was obtained.")

Under the consent exception, a warrantless search or seizure is justified so long as it is conducted pursuant to the consent of the subject of the search or the consent of a third party with common authority over the premises or effects sought to be inspected. United States v. Davis, 283 F. App'x 370, 372-73 (6th Cir. 2008) (citing United States v. Matlock, 415 U.S. 164, 171 (1974)). Any evidence discovered during a search based on consent may be seized and admitted at trial. United States v. Richardson, 949 F.2d 851, 858 (6th Cir. 1991) (citing Schneckloth, 412 U.S. at 243). To be valid, consent must be "unequivocally, specifically, and intelligently given, uncontaminated by any duress or coercion." United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999).  The question of whether consent to search was freely and voluntarily given "is a question of fact to be determined from the totality of the circumstances." Schneckloth 412 U.S. at 227. Courts should consider several factors when evaluating whether consent was voluntary, including: the age, intelligence, and education of the suspect; whether the suspect understands the right to refuse consent; the length and nature of the detention; the use of coercive or punishing conduct by the police; and indications of more subtle forms of coercion that might flaw the suspect's judgment.

18

United States v. Cochrane, 702 F.3d 334, 342 (6th Cir. 2012) (citing United States v. Watson, 423 U.S. 411, 424  (1976) (internal citations and quotation marks omitted). Significantly, "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." Ohio v. Robinette, 519 U.S. 33, 39 (U.S. 1996) (quoting  Schneckloth 412 U.S. at 227).

The undisputed  testimony presented at the June 6 evidentiary hearing clearly establishes that Slone's consent was unequivocal and specific. The facts are that as Agent Bunch was interviewing Slone, he noticed that Slone kept fidgeting with a bulge in his pocket.  Agent Bunch then asked Slone if he could see what was in his pocket. In response,  Slone removed the contents of his pocket, placing an undisclosed amount of U.S. currency and a glass bottle on the kitchen table. Agent Bunch then asked if he could look closer at the bottle, and Slone agreed. Agent Bunch observed ten (10) suspected oxycodone tablets inside the glass bottle. After this observation, Agent Bunch asked Slone if there were any additional oxycodone tablets or large sums of U.S. currency located in his home. Slone answered that there was not and told Agent Bunch to search any part of the home. Agent Bunch then clarified with Slone that he was granting the officers consent to search the home, vehicles, and any outbuilding on Slone's property. Slone agreed.  The Court finds, in light of these facts, the clarity and specificity of Slone's consent cannot reasonably be questioned.

The remaining issue is  thus, whether Slone's consent was voluntarily, or whether it was the result of coercion.  And, looking at the totality of the circumstances, the Court finds that the United States has carried it burden of proving, by a preponderance of the evidence, that Slone's consent to search was indeed his conscious choice.  The Court first considers that there is no evidence Slone's consent was unintelligent. While Billy testified that Slone did not finish high school or get his GED,

19

the Court has been presented with no evidence that the thirty nine (39) year old Defendant did not understand that when he told Agent Bunch the officers could search anywhere in the home, the vehicles, and outbuildings, he was granting the officers permission to search and seize evidence. The record reflects that Slone's conversation with Agent Bunch was coherent and logical. Thus, there is no reason to question the intelligence of Slone. *See* <u>United States v. Soto</u>, 124 Fed. Appx. 956, 964 (6th Cir. 2005) (finding an illiterate defendant with only an eleventh grade education voluntarily consented to a search based on the defendants conversation with police officers reflected in the record).

The Court also considers that the interview which led to Slone's consent was a brief twenty (20) minutes and that nearly all evidence contained in the record points to the conclusion that Slone's encounter with the officers was congenial.  Undisputed officer testimony at the June 6 evidentiary hearing established that only three (3) officers in an unmarked vehicle and in plain clothes, approached Slone's residence.  Before asking Slone any questions, Agent Bunch told him he was not under arrest but had been implicated in a drug trafficking conspiracy. Agent Bunch then asked Slone if he would be willing to answer some questions, and if he would be willing to aid in the officers' investigation of Russell West. Upon Slone's consent, the two spoke for only twenty (20) minutes before Slone granted the officers consent to search his home, vehicles and outbuildings. Thereafter, upon Detective Skeen's request, Slone agreed to go outside to secure his large dog so Detective Skeens could safely search outside. Slone went as far as to secure his dog at the back of the house to Detective Skeens could search the front of the home and to re-secure the dog at the front of the house when Detective Skeen moved his search to the back of the home. There is no evidence the officers ever raised their voice, brandished weapons, threatened, or physically restrained Slone

at any point during the interview. In fact, during the June 6 hearing, each of the officers remarked upon the polite and pleasant nature of the Slone encounter.

Next, the Court considers that there is no evidence of any coercive or punishing conduct by the police. Here, the officers went to Slone's residence for the purpose of asking him if he would be willing to cooperate in the investigation of Russell West. The officers did not draw their weapons, lie to, or threaten Slone; but simply told him why they were there. This "knock and talk" tactic is not considered to be a coercive practice. "Police officers are permitted to enter private property and approach the front door in order to ask questions or ask for consent to search the premises" Hardesty v. Hamburg Tp., 461 F.3d 646, 654 (6th Cir. 2006); *see also* United States v. Chambers, 395 F.3d 563, 568 n.2 (6th Cir. 2005) ("Courts generally have upheld [this "knock and talk"] investigative procedure as a legitimate effort to obtain a suspect's consent to search.")). The record presents no evidence the officers coerced, threatened, or punished Slone at any point during the remainder of the encounter.

Finally, the Court considers that the record does not reflect that Slone had been informed of his right to refuse.  Assuming that Slone did not understand this right,  this fact undoubtedly cuts against the finding that his consent was voluntary. Taking all of the relevant voluntariness factors into consideration, however, the failure to inform Slone of his right to refuse hardly rendered Slone's consent to search involuntary. Taken together, the facts at bar point to the conclusion that Slone's consent to search was a specific, intelligent, voluntary choice, unhampered by any police coercion.

This finding holds true even when considering Billy Slone's version of the facts which dispute the officers' testimony about their initial encounter with the Defendant.  As noted above, Billy claims that, before Agent Bunch requested that Slone speak with him, the officers barged in

Slone's home as he was standing at the side door, not exiting therefrom. Bill also claims the officers "surrounded" Slone, somehow grabbing him and leading him to the kitchen table. Billy's subjective observations, however, do not change the Court's analysis on the validity of Slone's consent.  Under the law of this Circuit,"the defendant must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police" to invalidate a consent to search. United States v. Crowder, 62 F.3d 782, 787 (6th Cir. 1995). Here, the facts remain undisputed that there were only three (3) officers at Slone's home, and only two (2) in the kitchen with him for most of the twenty (20) minute interview which led to Slone's consent. The officers arrived in an unmarked vehicle, in plain clothes, and never brandished any weapons, raised their voices, or threatened Slone during the interview or subsequent search. Billy does not maintain that Agent Bunch failed to inform Slone, at the outset of the interview, that he was not under arrest or that Agent Bunch failed to ask Billy *if* he wanted to talk to the officers and help them out with their investigation of Russell West. Moreover, Billy does not contest the facts surrounding Slone's consent or that Slone willfully went outside to secure his dog, actually aiding Detective Skeens in the outside search. Thus, looking at the totality of the circumstances, the record still reflects: 1) there is no reason to question Slone's intelligence; 2) the interview which led to Slone's consent lasted a mere twenty (20) minutes; 3) nearly all evidence contained in the record points to the conclusion that Slone's encounter with the officers was congenial; and 4) there is no evidence of any coercive or punishing conduct by the police. Accordingly, the Court finds that an objectively reasonable person would still not find Slone's consent to be involuntary or tainted by coercion.

Having determined that the United States has carried its burden of proving Slone consented to the search of his residence, the Court finds no violation of Slone's Fourth Amendment right. Thus,

suppression of any evidence seized during the June 29, 2012 search of his home is not warranted.

### III.  CONCLUSION

For the reasons set forth above, the undersigned hereby RECOMMENDS that the Slone's Motion to Suppress [R. 176] be DENIED.

Specific objections to this Report and Recommendation must be filed on or before June 28, 2013 or further appeal is waived.  <u>United States v. Campbell</u>, 261 F.3d 628, 632 (6th Cir. 2001); <u>Bituminous Cas. Corp. v. Combs Contracting Inc.</u>, 236 F. Supp. 2d 737, 749-750 (E.D. Ky. 2002). General objections or objections that require a judge's interpretation are insufficient to preserve the right to appeal.  <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004); <u>Miller v. Currie</u>, 50 F.3d 373, 380 (6th Cir. 1995).

Signed June 14, 2013.



Signed By:
*Edward B. Atkins*  *EBA*
**United States Magistrate Judge**